Anthony T. LEE et al., Plaintiffs,

United States of America,
Plaintiff-Intervenor,

National Education Assoc.,
Plaintiff-Intervenor,

v.

WASHINGTON COUNTY BOARD OF
EDUCATION et al., Defendants.

Civ. A. No. 5945–70–H.

United States District Court,
S. D. Alabama, S. D.

Sept. 6, 1978.

See also, D.C., 456 F.Supp. 1164.

Solomon S. Seay, Jr., Montgomery, Ala., J. U. Blacksher, Mobile, Ala., Jack Greenberg, NAACP Legal Defense Fund, New York City, for plaintiffs.

William A. Kimbrough, U. S. Atty., Mobile, Ala., Michael B. Wise, Ed. Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., for the U. S.

Edward P. Turner, Jr., Chatom, Ala., for Washington County Bd. of Ed.

HAND, District Judge.

This matter came on for trial before the Court on June 28 and 29, 1978 on the motion for further relief filed by intervenor National Education Association [NEA] on September 16, 1976 as amended on November 17, 1977. The Court has considered the pleadings, the record in this matter, the testimony and documentary evidence adduced at trial, and the oral arguments and memoranda of law propounded by counsel for all parties, together with the applicable law, and finds as follows:

## FINDINGS OF FACT

1. This lawsuit is part of the original state-wide school desegregation litigation, *Lee v. Macon County Board of Education*, Civil Action No. 604–E (M.D.Ala.). In this phase of the case the Court has been asked by intervenor NEA to review the propriety of certain administrative decisions concerning faculty and staff made by the defendant Washington County Board of Education [Board] and to determine whether the faculty assignment practiced by the Board is in line with the requirements of the January 22, 1970 terminal order of the three judge panel. Tangentially, the government has, in light of evidence adduced at trial and from Board reports, requested that the Court reconsider its order of February 10, 1977 finding that the Washington County School System is unitary and desegregated.

2. There are seven issues presently ripe for consideration:

(a) Whether the terms of the 1970 terminal order have been complied with;

(b) Whether Rubye Nelson was denied her constitutional rights when she was not offered a summer teaching position in 1977;

(c) Whether the Board unlawfully discriminated against Brenda Fancher with respect to the termination of her employment at the close of the 1976–77 school year;

(d) Whether Vera Breech was unlawfully passed over for a promotion by reason of her race;

(e) Whether the Board was guilty of racial discrimination in the hiring of three new principals prior to the 1976–77 school year;

(f) Whether the Board engages in racially discriminatory employment practices; and

(g) Whether this Court's order of February 10, 1977 ought to be reconsidered. For purposes of clarity, the Court will enter separate Findings with respect to each issue raised by the intervenor and the government.

### A. Faculty Assignment

3. The terminal order entered by the three judge panel on January 22, 1970, contained the following language:

The school board shall announce and implement the following policies:

a. Effective not later than the commencement of the 1970–71 school year the principals, teachers, teacher-aides, and other staff members who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. The Washington County School Board shall assign the teaching staff as above described so that the ratio of Negro to white teachers in each school, and the Negro-to-white ratio of other staff members in each school, are substantially the same as each such ratio is for the teachers and other staff members in the entire system . . . . .

4. Intervenor's Exhibits 6, 7, and 28 reveal the faculty assignment figures at Washington County schools for the school

years 1970–71 to 1977–78. The figures are set out in the attached chart, *infra,* identified as attachment "1". It is readily apparent from these figures that the Board has never complied with the faculty assignment provisions of the 1970 terminal order, and that such compliance must be required.

### B. Selection of the 1977 Summer School Personnel

5. Rubye Nelson, a black teacher, has contested the selection process employed by the Board for the hiring of teachers for the 1977 summer school term held at McIntosh High School. Her contention is that although she was one of the first to apply for a position and had qualifications superior to most others, she was denied employment in the program in favor of less qualified and more inexperienced white teachers.

6. The McIntosh program is no longer operated, but it did exist for three summers between 1975 and 1977. This was a federally funded Title I program aimed primarily at remedial reading and math at the seventh and eighth grade levels. The program lasted six weeks each summer.

7. The Board's policy for selection of teachers for the summer program was to act upon recommendations received by the principal of McIntosh High School. The principal at the close of the 1976–77 school year was Larry Tillman, who is white. In order to receive applications for the positions available, Tillman asked for volunteers among the teachers at McIntosh High School, and posted a list in the school's office. This request produced seven volunteers, four blacks and three whites. The black teachers were Myrtle Ferrell, Georgeianne Brown, Rubye Nelson, and Napoleon Reed; the white teachers were Otis James, Cathy Daughtery, and Tina Lane.

Tillman determined that he needed two math teachers and two english teachers to adequately provide the educational services mandated by the program. The applicants with a math background were Ferrell, Lane, and Reed, while those with an english background were Ferrell, James, Brown, Nelson, and Daughtery. On this basis, Tillman offered math positions to Ferrell and Reed, and english positions to James and Daughtery. Reed rejected the offer so the second math position went to Lane. Thus, there were three whites and one black in the summer school teaching corps.[1] The Board accepted the decision by the principal and these appointments were ultimately made.

8. The institutional records (defendant's Exhibit 20) with respect to Rubye Nelson revealed that she is a black female 33 or 34 years of age with twelve years experience with the Board. She possesses a AA certificate[2] that expires in 1986. Her experience included 30 hours teaching library science and 18 hours of english teaching.

The same records reflect that Cathy Daughtery is a 30 or 31 year old white female with five years experience with the Board. She has a rank 2 certificate[3] which expires this year. Her experience consisted of 18 hours of english teaching.

The record reflects that Myrtle Ferrell is a 50 or 51 year old black female with twenty-nine years experience with the Board. She possesses a rank 2 certificate which will expire in 1979. Her experience consisted of 30 hours of Title I teaching.

The record reflects that Georgeianne Brown is a 33 or 34 year old black female with seven years experience with the Board. She possesses a rank 2 certificate that will expire in 1982. Her experience consists of 30 hours of english teaching.

---

1. The Court finds no racial discrimination indicated by these statistics. Beyond the fact that the principal's original decision would have resulted in a 50/50 racial composition, there was testimony revealing that the 1975 and 1976 summer school teachers corps, selected by a black principal, had both contained three blacks and one white.

2. The AA certificate indicates that the holder has 30 hours beyond a master's degree.

3. The rank 2 certificate indicates that the holder possesses a bachelor's degree.

The record reflects that Otis James is a 32 or 33 year old white male with nine years experience with the Board. He possesses a rank 2 certificate that will expire in 1983. His experience consisted of 27 hours of english teaching.

The Court does not concern itself with the qualifications of Reed or Lane, since the evidence is clear that math teachers were required and that Nelson was not qualified by either education or experience to hold a math position.

9. The testimony of Tillman revealed that he did not fail to recommend Rubye Nelson for this position because she was black, but he offered no explanation for the recommendation of Daughtery and James instead of Nelson, whose objective qualifications were superior.

*C. Dismissal of Brenda Fancher*

10. The institutional records with respect to Brenda Joyce Fancher (defendant's Exhibit 20) reveal that she is a 26 year old black female who was first employed by the Board for the 1975–76 school year. She possesses a rank 2 certificate with 20 hours of teaching experience in the special education field.

11. Fancher taught special education at Leroy High School during the 1975–76 and 1976–77 school years, the only two years that she was employed by the Board. Although she had an elementary education certificate, she also had 12 hours of training in special education. Her dispute with the Board centers around the Board's failure to renew her contract at the close of the 1976–77 school year, with Fancher alleging that such non-renewal was racially motivated.

12. Prior to the close of the 1976–77 school year Jerry Reed, principal at Leroy High School, informed Fancher that her contract was not going to be renewed because a teacher with superior qualifications

in the field of special education was going to be hired to take her place. Both prior to and subsequent to receiving notice of non-renewal, Fancher had had conversations with Reed concerning the possibility of her receiving a position in her field of elementary education. Reed informed her that he would put her name up if a position came open.

Shortly before the opening of the 1977–78 school year, Fancher again talked to Reed about an elementary education position that Fancher had heard was available at Leroy. Reed said he thought she had gotten a job in Mobile and thus he had forgotten about her since he thought she was no longer interested. One week later Fancher talked with Reed again about a first and second grade teaching position that she had heard was open and Reed said she would be considered, but he never called Fancher back concerning this position.[4] Fancher's last conversation with Reed occurred after school had begun and concerned a position as an elementary physical education instructor. Reed said that the position would not be filled until after the next Board meeting, but Fancher learned prior to that meeting that the position had already been filled. Fancher's testimony was that she was at all times able and willing to accept an elementary position if it had been offered, but that the Board never did offer her such a position.

13. Intervenor's Exhibit 8 is a list of teachers in the Washington County School System who were not renewed at the close of the 1976–77 school year by the Board. The list reflects that four of the teachers were black and four were white. Intervenor's Exhibit 9 reveals that all four white teachers were subsequently rehired for the 1977–78 school year, but that only one of the black teachers was rehired. Testimony by Board Superintendent John Wood failed to reveal any reason for this pattern, other

4. The position was as a temporary replacement for a teacher who was ill and was unable to teach for the first few weeks of school. The position was filled by Mrs. Allen, who was supposed to teach only until Mrs. Horn, the sick teacher, returned from the hospital.

When Mrs. Horn returned, however, Mrs. Allen was retained as a permanent teacher due to an increase in enrollment. Reed's testimony was that he had already promised the position to Mrs. Allen at the time that Fancher spoke with him.

than the fact evident on the exhibit that the rehired white teachers replaced four other white teachers who had retired, resigned, or taken a leave of absence. There was no evidence indicating that Brenda Fancher was considered for appointment to any of these positions, two of which involved second grade teaching, one involving english teaching, and one involving special education at the elementary level.[5]

14. Intervenor's Exhibit 5 reveals that the Board hired five new teachers for the 1977–78 school year who were certified in elementary education or elementary-secondary education, and two other teachers who were provisionally certified. Of these seven new employees, six were white and one was black.

Two of these new employees' taught at the elementary level at Leroy, a position for which Fancher was admittedly qualified and one that she had sought in her conversations with principal Jerry Reed. Testimony by Superintendent Wood revealed that he did not know why Fancher was not offered either of these positions, nor did he even recall Fancher coming by his office to discuss such a position with him.

In addition to the elementary level hirings, Mary Finley was hired to replace Fancher as a special education instructor at Leroy. Although Finley is now certified in special education, she taught in the fall of 1976 with only a provisional certificate.[6] In order to obtain such a certificate, the Board was required to certify to the Alabama Department of Education that it had been unable to find a qualified teacher of any race to hold the position. The evidence does not clearly point to the reason why Fancher, who had taught the class the previous year, was not considered qualified for the position, but it appears that Finley was favored for the position because all of her work had been in special education.[7]

### D. Selection of Special Education Coordinator for Washington County

15. In this portion of the lawsuit the Court has been called upon to consider the propriety of the selection of Mary Katherine Metzger as special education coordinator for Washington County prior to the 1975–76 school year. The intervenor contends that Vera Breech should have been named to that position and that the Board's refusal to name her was racially motivated.

16. Vera Breech, a black female, possesses a master's degree in special education which she received in 1971. She has seventeen years experience as a teacher in Washington County and has been involved in the area of special education for seven of those years. From 1969 to 1972 she participated in the Board's Homebound program. She also served on the Board of Directors for the exceptional children's day care organization. Most recently, Breech has taught special education classes at McIntosh High School. Breech has a rank 1 certificate with an X7 endorsement, indicating that she is certified for teaching the mentally

---

5. Merely from a certificate standpoint, the Court finds that Fancher was qualified to teach at the second grade level. Additionally, from an experience standpoint, Fancher was likely qualified to teach special education. However, there is no evidence indicating that she was qualified to teach english.

6. Testimony revealed that at the time that Finley was hired in the early summer of 1976 it was fully expected by both Finley and by the Board that she would be certified in special education by the commencement of the 1976–77 school year. However, due to a miscalculation of her credit hours, she was two hours short of graduation at the start of the school year. She completed her requirements at Troy State University during the fall of 1977 and is now certified to the requisite degree. In order

to teach in the fall of 1977, the Board was compelled to obtain a provisional certificate for Finley from the Alabama Department of Education.

7. The testimony of Superintendent Wood revealed that Fancher's non-renewal had been suggested by Principal Jerry Reed on the ground that Fancher had not been doing her work and could not handle children. However, Reed's evaluation report on Fancher (intervenor's Exhibit 2) does not reveal that her efforts were seriously lacking. Other testimony by Mary Katherine Metzger, special education coordinator for the Board, indicated that she found Fancher to be an "average to below average" special education teacher.

retarded. She was so certified in 1971 and the certification extends until 1981. Breech had 27 hours of special education teaching experience at the close of the 1975–76 school year (defendant's Exhibit 20).

17. Mary Katherine Metzger, a white female, was hired by the Board as special education coordinator for Washington County prior to the 1975–76 school year. Her academic attributes are identical to those of Vera Breech in that she possesses a rank 1 certificate with an X7 endorsement in mental retardation.[8] The Board's institutional records (defendant's Exhibit 20) reveal that Metzger has seven years experience with the Board and had 48 hours of special education teaching experience by the close of the 1975–76 school year. She received her certification in 1974 and it will expire in 1984.

18. Washington County first had its own special education coordinator during the 1975–76 school year, and Metzger is the only one who has held this position. Prior to this the County was served by a tri-county coordinator who had oversight responsibility for special education programs in Choctaw and Clarke Counties in addition to Washington County. As early as March of 1972 Breech spoke with Superintendent John Wood concerning the possibility of her being appointed to the tri-county coordinator's position, but he informed her that he had no input into the selection process for that position and could be of no aid. This was the only indication made by Breech to the Board that she desired an appointment to the special education coordinator post.

As mentioned above, the coordinator position for Washington County first came open for the 1975–76 school year. The record indicates that Metzger was hired at the April 9, 1975 Board meeting and undertook her responsibilities in August of 1975. There was no advertisement of the position by the Board, and Metzger was apparently the only applicant for the position. Testimony by Superintendent Wood indicates that Metzger was the only one who was considered for appointment to the position.

19. Testimony of Vera Breech indicates that she first became aware of the new coordinator's position in August of 1975 when the Board informed her that she would be teaching special education instead of english during the 1975–76 school year. She further testified that she would have accepted the position if it had been offered to her. The complaint with respect to Breech's allegations of discrimination was filed on September 13, 1976.

### E. 1976–77 Principal Selections

20. The next issues raised by the intervenor concern the selection of three principals made by the Board during the summer of 1976. The selections were to fill vacancies existing at Leroy High School, McIntosh High School, and Washington County High School. In each case the Board selected a white applicant out of a pool of qualified members of both races.

21. The policy of the Washington County Board of Education with respect to the filling of principalship vacancies is not to advertise; that is, the Board expects that qualified individuals will become aware of the openings through word of mouth. Although the intervenor alleges that such a policy is discriminatory and urges that some system of public notice is required, the evidence indicates that the policy did not lead, in this situation, to a lack of qualified applicants, either black or white.[9]

---

8. Metzger's personnel file (intervenor's Exhibit 12) reveals that she had been doing course work toward her master's degree at the University of South Alabama in 1974, and institutional records (defendant's Exhibit 18) indicate that she had her master's degree during the 1974–75 school year.

9. While the Court is convinced that there was no showing that the lack of notice served to discriminate against anyone by reason of race, the Court is concerned that mere word of mouth notification is not in keeping with the sound administrative procedure that the Board is bound by law to follow. Therefore, in the

## I. *Leroy High School*

22. Leroy High School was a traditionally white school under the dual school system existing prior to the desegregation order of the three judge panel. The most recent report from the Board indicates that the school is still a majority white school.[10] Also, the school has a predominately white faculty.[11]

23. At the close of the 1975–76 school year, Joseph Palmer, a white male, retired as principal at Leroy High School. The Board, acceding to customary practice, did not advertise the opening but did accept written applications.[12] Those persons applying at Leroy included white males Andrew Gibson, Thomas Henson, Otis M. James, James W. Lee, and Jerry Reed, the eventual appointee, and black males George Holcombe and Cleophus Stephens. Testimony of Superintendent Wood indicates that these were the only persons making application at Leroy High School, and were the only ones considered for the position by the Board.

24. According to Superintendent Wood, the Board considered each applicant in five different areas:

(1) Experience
(2) Academic background
(3) Reputation
(4) Ability to get along with others
(5) Board experience with the individual

Although the testimony of Superintendent Wood did not reveal it, a sixth and perhaps most important criteria is the recommendation of the Board of Trustees at the school at which the principalship opening lies.

25. The seven applicants considered for the Leroy position were evenly matched academically—each had a superintendent-principal certificate or had completed the course work for such a certificate at the time the selection was before the Board. Individual analysis of the applicants reveals the following:

(a) Andrew Gibson—Gibson is a 42 year old white male who had eleven years experience in education at the time of the Board's deliberations (defendant's Exhibit 9). He taught at Mantachie High School in Itawamba County, Mississippi from 1968 to 1970, at Kemper Academy in DeKalb, Mississippi from 1970 to 1972, at Aliceville High School in Pickens County, Alabama from 1972 to 1975, and at South Choctaw High School in Choctaw County, Alabama from 1975 to 1976 before being employed by the Washington County Board (defendant's Exhibit 9). His certificate (defendant's Exhibit 8) indicates that he is certified as a superintendent-principal and that he possesses a master's degree.

(b) Thomas Henson—Henson, a white male, is no longer with the Washington County system and the Board thus no longer maintains a personnel file on him. Henson's letter of application (defendant's Exhibit 5) indicates that at the time of his application he possessed a master's degree in secondary education and expected his superintendent-principal certificate in time for the next school year. The application indicates that Henson taught at Leroy High School for five years, served as principal and sixth grade teacher at Boykin Elementary for two years, served as headmaster of

interest of assuring that the most qualified persons are made available, the Court is convinced that the notice policy previously employed by the Board (or lack thereof) ought to be reconsidered.

10. The January 26, 1978 report by the Board (intervenor's Exhibit 6) indicates that Leroy High School has 345 white students and 230 black students, a 60%/40% ratio.

11. The 1978 report (note 10, *supra*) indicates that there are 29 white teachers and 9 black teachers at Leroy, a ratio of 76%/24%.

12. Since the Court has concluded, *supra* at note 9, that the failure to advertise did not serve to discriminate by race against anyone, the Court rejects the intervenor's theory that each applicant for any position ought to have been considered for every position. Rather, since most applications sought specific positions, the Court will limit its analysis to those applicants seeking specific positions.

South Choctaw Academy for four years and was, at the time of application, in his second year at McIntosh Academy.

(c) Otis James—James, a white male, has a master's degree and holds class A certificates in both administration and in secondary education (defendant's Exhibit 2). James did not have his superintendent-principal certificate at the time of application, but he would have received it in time to assume his duties. James taught in Washington County schools from 1967 to 1969 and had taught at Citronelle High School from 1969 to 1976 (defendant's Exhibit 6). Additionally, testimony of Superintendent Wood indicates that James had one year's experience as an assistant principal and one year as a principal.

(d) James Lee—Lee, a white male, has a master's degree in educational administration and, at the time of consideration, had received his superintendent-principal certification. Lee's experience included a teaching stint in Austell, Georgia from 1965 to 1966, three years in the U. S. Army from 1967 to 1970, an assistant principalship at Griffin, Georgia from 1971 to 1972, and teaching experience at McIntosh High School from 1973 to the time of his application (defendant's Exhibits 3 & 7).

(e) Jerry Reed—Reed, a white male, has a master's degree in secondary education and, at the time of consideration, had completed his requirements for his superintendent-principal certification, although his certificate was not received until later (intervenor's Exhibits 16 & 20). Reed has been employed by the Washington County system since 1966, teaching at Millry High School, Fruitdale High, and then Leroy High prior to applying for the principalship (intervenor's Exhibit 16).

(f) George Holcombe [13]—Holcombe, a black male, possesses a master's degree in secondary education and is certified for a superintendent-principal position (defendant's Exhibit 21). His application sought consideration for any administrative opening (intervenor's Exhibit 26). The evidence does not reveal the range of his educational experience, other than indicating that he has twenty-five years experience in education (defendant's Exhibit 20). Holcombe was appointed principal at Chatom Middle School prior to the 1977–78 school year, and is presently serving in that capacity.

(g) Cleophus Stephens—Stephens, a black male, possesses a master's degree in school administration and supervision that he received in August of 1976, after the Board's deliberations but prior to the commencement of the school year for which he was applying. Stephens' letter of application (intervenor's Exhibit 24) informed the Board of this so he was actually in the same position as the other applicants who had not received certification at the time the Board was considering applications. Additionally, however, is the fact that Stephens' personnel file (intervenor's Exhibit 25) contains only a class B certificate, indicating only a bachelor's degree. The institutional records (defendant's Exhibit 20) indicate that Stephens had twelve years of educational experience and had received his superintendent-principal certificate, and testimony revealed that he had some experience as an assistant principal at Fruitdale High School.

26. The evidence is clear that the applicants for the Leroy High School principal's position were almost all evenly qualified academically, and that each applicant had experience that was different from every other. Testimony of Superintendent Wood revealed that the Board considered each

---

**13.** Testimony by Superintendent Wood indicated that the Board considers Holcombe's complaints mooted by his appointment to a principalship position at the Chatom Middle School prior to the 1977–78 school year. Wood testified that Holcombe was only interested in the Chatom Middle School position, in spite of his letter of application (intervenor's Exhibit 26) indicating an interest in any administrative opening. This testimony was unsubstantiated so the Court will consider Holcombe's qualifications along with all the others.

and every applicant for the Leroy position qualified and capable of holding that position, and that the applications of Holcombe and Stephens, the black males, were given the same consideration as was given to the white males. The only apparent basis adduced from the evidence for hiring Reed as principal at Leroy High School over the other persons black and white who were equally qualified academically and, perhaps, better qualified from an experience standpoint is the fact that the Board of Trustees at Leroy High School recommended Reed over the other applicants.

27. In filling a principalship position in the system's high schools the Board relies upon the opinion of the local Board of Trustees at each school. These Trustees are elected locally and aid the Board by providing general oversight in the administration of the respective schools. The Board at Leroy at the time of the principalship vacancy was composed of two whites and one black, and these Trustees recommended to the Board that Reed be appointed as principal. The actual weight given this recommendation by the Board was not revealed by the evidence, but it is clear that the Trustees' recommendation is an important criteria considered by the Board in selecting a principal.

## II. *McIntosh High School*

28. McIntosh High School was a traditionally black school under the dual school system existing prior to the desegregation order of the three judge panel. The most recent report from the Board indicates that the school remains majority black [14] and has a majority black faculty by one.[15] The selection of Larry Tillman as principal in the

14. The 1978 report (note 10, *supra*) indicates that McIntosh High has 196 white students and 340 black students, a 37%/63% ratio.

15. The 1978 report (note 10, *supra*) indicates that McIntosh High has 13 white teachers and 14 black teachers, a 48%/52% ratio.

16. Two other individuals were considered by the McIntosh Board of Trustees at its July 3,

summer of 1976 marked the first white principal ever at McIntosh High School.

29. At the close of the 1975–76 school year, Hilliard Wiggins, a black male, retired as principal of McIntosh High School. No advertisement was made by the Board, but seven written applications were received for the position. The white applicants were Thomas Henson, Otis James, James Lee, and Larry Tillman. The black applicants were George Holcombe and Warren Roberts. The Indian applicant was Gallasneed Weaver. These were the only persons considered by the Board for the principal's position at McIntosh High School.[16]

30. The record for applicants Henson, James, Lee, and Holcombe have been set out above with respect to their applications for the position at Leroy High School.[17] As was true at Leroy, there was little distinction between the academic qualifications of the applicants, except in the case of Larry Tillman, whose superintendent-principal certification was not effective until one year after the Board made its decision. The evidence with respect to Tillman, Roberts, and Weaver reveals:

(a) Larry Tillman—Tillman is a 41 year old white male who possesses a master's degree in theology (intervenor's Exhibit 29). The extent of his teaching experience is not made clear by the evidence, but it was shown that Tillman taught in Louisiana as far back as 1964 and in Choctaw County, Alabama during the 1968–69 school year (intervenor's Exhibit 27). At the time of his appointment Tillman had four years experience in the Washington County system (intervenor's Exhibit 17). The record is quite clear that Tillman was not evenly qualified with the other applicants on an

1976 meeting, Irby Windham Pittman of Prattville and Fred Thomas, Jr. of Selma (intervenor's Exhibit 23). No evidence was adduced at trial with respect to the qualifications of either of these individuals.

17. *See* Findings of Fact 25(b), (c), (d) & (f), *supra*.

academic level, since his superintendent-principal certificate did not become effective until the commencement of the 1977–78 school year, one year after Tillman began his tenure as principal at McIntosh. All other applicants were so certified at the time of appointment or eligible for certification prior to the commencement of the 1976–77 school year.

(b) Warren Roberts—Roberts is a 30 year old black male who holds a master's degree in secondary education. His letter of application to the Board for the McIntosh position (intervenor's Exhibit 21) reveals that although he did not have his superintendent-principal certificate at the time of application, he would complete the necessary course work prior to the time he would have to assume his duties if he received the appointment. His resume reveals that at the time of his application he had seven years experience as a mathematics teacher at Leroy High School and had coached junior high basketball during that period (intervenor's Exhibit 21).

(c) Gallasneed Weaver—Weaver is a 44 year old Indian male who has a master's degree in secondary education (defendant's Exhibit 12–13). He has held a superintendent-principal certificate since 1969, and was at the time of his application serving as principal at Reed's Chapel Elementary School in McIntosh (intervenor's Exhibit 13, defendant's Exhibit 20). Weaver had fifteen years experience in education (defendant's Exhibit 20) but his tenure as principal at Reed's Chapel was not disclosed by the evidence.[18]

18. It is clear from the institutional records (defendant's Exhibits 14–19) that Weaver had at least 6 years experience as a principal, but it is not clear whether he had served as principal at any time prior to 1970–71.

19. It is interesting to note that although Gallasneed Weaver is a member of the intervenor's organization (defendant's Exhibit 13) and was considered to be one of the two best qualified applicants on an objective basis (see text), the NEA has not raised the issue of whether he was discriminated against by reason of his

31. The opinion of Superintendent Wood as reflected by his testimony is that, from an experience standpoint, Henson and Weaver [19] were the best qualified applicants due to their prior experience as principals. He placed Lee and James next on his list, since each had some prior experience as a principal. The evidence is clear, in any event, that the Board selected an applicant who was not the most qualified, whether an academic or experience guideline was followed. Again, the Board relied upon the recommendation of the local Board of Trustees at McIntosh High School, composed of two blacks and one white, who recommended that Larry Tillman be appointed as principal (intervenor's Exhibit 23). The Trustees' recommendation was conditional, however, and it was stipulated that the recommendation should be followed only if Tillman could meet the minimum qualifications for certification or gain Board approval without certification, and only if such appointment would not jeopardize McIntosh's accreditation. Apparently the conditions were met, for Tillman served his first year without a certificate and no accreditation harm was caused.

### III. *Washington County High School*

32. Washington County High School in the county seat of Chatom was a traditionally white school under the dual system existing prior to the desegregation order entered by the three judge panel. The most recent report from the Board indicates that the school remains predominately white [20] and continues to have a predominately white faculty.[21]

race. It is perhaps likely that the NEA finds some races more worthy of representation than others.

20. The 1978 report (note 10, *supra*) indicates that Washington County High School has 283 white students and 92 black students, a ratio of 75%/25%.

21. The 1978 report (note 10, *supra*) reveals that Washington County High has 19 white teachers and 4 black teachers, a ratio of 83%/17%.

33. At the close of the 1975–76 school year Clayton McMillan, a white male, retired as principal of Washington County High School. No advertisement was made by the Board, but five written applications were received for the position. The white applicants were Andrew Gibson, David Howell, Otis James, and James Lee, while George Holcombe was the lone black applicant. These were the only persons considered for the principal vacancy at Washington County High School.

34. The record with respect to applicants Gibson, James, Lee, and Holcombe is set out above in connection with their respective applicants for the Leroy position.[22] The record with respect to Howell indicates that he had an experience edge on the other applicants since he was serving as principal at Fruitdale High School (defendant's Exhibit 19). Howell, a white male, possessed his superintendent-principal certificate at the time of his application (defendant's Exhibit 11), and had 24 years experience in education (defendant's Exhibit 19).

35. All of the applicants for the Washington County High position possessed equal academic credentials, but the experience edge went to Howell because of his experience at Fruitdale High. Other testimony revealed that Lee and James had some previous experience as principals. Nevertheless, the appointment went to Andrew Gibson on the basis of an unanimous recommendation by the Washington County High Board of Trustees, which included two whites and one black. This was yet another occasion where the most objectively qualified applicants, based on academic credentials and professional experience, were passed over in favor of the lesser qualified individual who had received the recommendation of the school's Trustees after the Trustees had conducted their own investigation.

22. *See* Findings of Fact 25(a), (c), (d), & (f), *supra.*

23. George Holcombe was the head basketball coach at Washington County High for two years, while Mamie Johnson and Doris Bonds

## F. Discriminatory Employment Practices By The Board

36. The intervenor's final contention alleges that the Board has been guilty of racially discriminatory employment practices, citing the evidence set out above together with statistics relating to head coaches within the Washington County system and the employees at the Board's central office in Chatom.

37. On the coaching issue, the intervenor alleges that no blacks have been hired as head coaches since the desegregation order, while 14 whites have been so employed. Also, while 16 white assistant coaches have been hired during the same period, only two black assistants have been hired. While these statistics are correct, they are misleading to the extent that they do not reflect the true number of blacks coaching within the system. Several blacks who were in the system prior to the desegregation order are coaching or have coached since the entry of that order.[23] The testimony of Superintendent Wood, uncontroverted by any evidence put on by the intervenor, reveals that David Davis is the only black who has applied for a head football coaching position with the Board since 1970, and that he has been appointed head football coach at McIntosh High School for the upcoming year. There is no evidence with respect to the number of applicants in other sports, and the intervenor put on no evidence to show that qualified blacks were passed over for any of the positions to which white coaches were ultimately hired.

38. The Board's central staff is composed of four employees—a Title I bookkeeper, a Board bookkeeper, and two secretaries—and has been so composed since the 1970 desegregation order. All four employees were white at the time of the 1970 decree, and the office has remained all white since that time. The evidence is clear

are presently coaching girls' basketball at Leroy and McIntosh High Schools, respectively. Other blacks, the evidence revealed, have *served as assistant coaches in various sports in* various schools.

that the reason the staff has remained all white has been a lack of black applicants— the first black application for any of the positions was received in May of 1978. It is not clear whether the lack of black applications resulted from a lack of qualified blacks in the area, or from a policy or practice on the Board's part in not advertising its openings to the general public.

### G. Reconsideration of the February 10, 1977 Order

39. This was the only issue raised at trial by the United States. The government contends that this Court's order of February 10, 1977 finding the Washington County School System to be unitary and desegregated ought to be reconsidered and then withdrawn in light of evidence adduced at trial by the intervenor, especially in the area of faculty assignment.

40. This Court's Order of February 10, 1977, with respect to Washington County, found that:

> There has been comparatively little activity in the Washington County case though there is now pending a claim that the parties are under order to resolve if possible. This Court believes the terminal order sufficed to establish a unitary system, but out of an abundance of caution so as to set in motion the procedures to close this case, the Court now specifically finds that this system has achieved a unitary status and is desegregated in nature. Reports . . . are to be filed and served in accordance with the time schedule provided for the Baldwin County System.

On March 16, 1977 the government filed objections to this order, specifically arguing with respect to Washington County that serious questions as to whether the Board was operating in compliance with prior court orders remained to be litigated, and that this Court's unitary and desegregated finding was therefore premature. The objections were overruled on October 13, 1977 and no appeal was taken, either from the order declaring the system unitary and de-segregated, or from the order overruling the government's objections to that order.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this lawsuit and the parties hereto by virtue of Title 42, U.S.C.A., §§ 1983 and 2000d–6.

■ 2. On the faculty assignment issue, the Court is convinced that the defendant Board has not complied with its duties under existing law and under prior orders of this Court, since the evidence is clear and convincing that the Board has failed to assign its teachers and other staff in such a manner that the black-white ratio at each school is equal to or similar to the system-wide ratio. As a result of this, various schools remain racially identifiable by virtue of the composition of their faculties. The defendant Board has conceded non-compliance in this area and has been in the process of formulating a legitimate plan for the coming year. The Court intends to closely monitor this situation to ensure that future violations do not occur.

■ On a related issue, the Court has become aware since the time of trial that faculty selection in Washington County is, for the most part, conducted on a school-by-school basis by the principal at each school. Although the Board has the final say on hiring, it has become clear that the Board relies on each principal to fill out his staff. Although the Court finds nothing impermissible in this practice standing alone, the Court does instruct the Board to take care that such practices do not result in racial quotas. The law requires that the Board employ the best qualified teachers for the positions needed without regard to race, and then that the racial composition at each school be equal to or similar to such composition in the system as a whole. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (5th Cir. 1970). A process by which the ratio is determined prior to hiring, thus creating "black" or "white" vacancies, is impermissible. Such a

process imputes racial motivations into the hiring process and does not assure the hiring of the most qualified applicants. The Court instructs the Board that, by whatever means possible, it must adopt a process by which the most qualified teachers are hired, regardless of race, and by which the requirements of *Singleton, supra,* are met.

■■ 3. The first individual claim facing the Court is that of Rubye Nelson contesting the selection of the 1977 summer school personnel. While the federal court should be wary of obtrusive intervention in such internal school affairs as personnel decisions, *Megill v. Board of Regents of the State of Florida,* 541 F.2d 1073 (5th Cir. 1976), where important constitutional rights are in issue this Court cannot refuse to act. Here the evidence is clear that Nelson was the most academically qualified applicant for employment during the summer session as an English teacher, and that both english teaching positions were offered to and accepted by white applicants. The Court is convinced that such evidence creates a prima facie case of discrimination, and casts upon the Board the burden of establishing that there were legitimate, non-discriminatory reasons for the failure to appoint Nelson to this position. Although *Singleton, supra,* is not applicable here to invoke the discrimination *per se* rule, there is authority for this burden-shifting process in *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir. 1966). Under this rationale the Court must find for Nelson, for the Board's only explanation for the failure to hire her was that it relied upon the recommendations of the McIntosh principal, clearly an impermissible standard for teacher employment under the law. Although the principal testified that he did not fail to offer Nelson the position because of her race, he was not able to articulate any rational basis for his failure to do so. While the Board's reliance upon the principal's recommendations is not in itself impermissible, where the evidence reveals, as here, that the principal failed to consider non-racial objective criteria in his decision

the acceptance of the recommendation cannot be allowed to stand. Accordingly, the Court finds for Rubye Nelson on her claim of discrimination, and concludes that she is entitled to back pay in an amount equal to the amount that she would have received had she been employed as a teacher during the 1977 summer school session.

■ 4. The next individual claim is that of Brenda Fancher, who objects to the fact that she was not awarded a position within the system at the commencement of the 1977–78 school year after her contract was non-renewed at the close of the 1976–77 school year. As with Nelson, the Court is convinced that Fancher has established a prima facie case of racial discrimination and that the Board has failed to effectively rebut the presumption arising therefrom. The evidence was clear that Fancher had more than adequately performed her duties as a special education teacher and that she was supplanted by another teacher who, like Fancher, did not possess special education certification. While this in itself does not indicate any discriminatory treatment, the Board's complete indifference to Fancher's continued efforts to obtain renewed employment, as set out in the Findings of Fact, *supra,* together with the fact that the Board hired five new white teachers for the 1976–77 school year who, like Fancher, were certified in elementary education, convinces the Court that such practices cannot be allowed to go unexplained. There was no testimony that these new teachers hired were better qualified than Fancher. The only explanation was that Fancher was thought to have obtained other employment and was forgotten, but this explanation fails to articulate any reasons behind the denial of employment to her for the positions that were open at the start of the school year when she had renewed her efforts. Under this state of the law and the facts, the Court is convinced that Fancher must prevail on her claim, and the Court concludes that she is entitled to reinstatement within the system as an elementary teacher and to back pay for the 1977–78

school year in an amount equal to that which would be paid to an elementary teacher with two years experience, decreased by the amount she earned in other employment during that period, together with credit toward tenure and all other rights she might have availed herself of had she not been non-renewed.

■ 5. The third individual claim is that of Vera Breech, who contends that she was passed over for promotion to the special education coordinator's position by reason of her race. The evidence indicates that both Breech and Mary Metzger, the ultimate appointee possessed identical academic qualifications; and that Breech had an experience edge to the extent that she had been teaching longer. On the other hand, other evidence revealed that Metzger had more extensive experience in special education than Breech, and that Metzger was the only applicant for the position.[24] Even assuming a prima facie case of discrimination under the facts on this matter, the Court is convinced by a comparison of the objective qualifications of the individuals involved that there were legitimate non-discriminatory reasons for accepting Metzger over Breech for the position. Accordingly, on the claims of Vera Breech, the Court finds for the defendant Board.

■ 6. The final individual claims relate to the 1976–77 principal selections, with the NEA contending that George Holcombe, Cleophus Stephens, and Warren Roberts should have been selected to fill the openings at Leroy, McIntosh and Washington County High Schools. In order to establish any right to relief, either with respect to Leroy, McIntosh, or Washington County, it is incumbent upon the teacher to establish that, measured by objective criteria, he was the best qualified to hold the position. *Lee v. Chambers County Board of Education,* 533 F.2d 132 (5th Cir. 1976). And, this Court is convinced, a mere showing that the selections were not predicated upon objective criteria is not sufficient without a showing that utilization of such criteria would have resulted in that teacher's promotion. Each selection in this case merits individual consideration.

(a) Leroy High School—Holcombe and Stephens are the only individuals that the Court considers to have standing to contest the Leroy selection.[25] The Court rejects the intervenor's assertion that the lack of the requisite certification on the part of some applicants should serve to bar those applicants from consideration, and concludes that those applicants who had completed the requisite course work for certification and lacked only the paper notification of certification were equally qualified academically with those applicants who already possessed the requisite paper certification. Thus, all eight of the Leroy applicants were evenly matched from an academic standpoint. From the experience standpoint, Holcombe could have been favored for his twenty-five years in education. However, both Henson and James had prior experience as principal at other schools, and such specialized experience would have to carry more weight than mere longevity. Of course, the weight to be given such considerations is more ably determined by educational administrators than by judicial officers, so the Court cannot conclude that any individual's experience outranked any other. Three other criteria are past experience of the Board with the individual, reputation of the individual, and demonstrated ability to get along with others, matters clearly within the comprehension of the Board.

---

**24.** The Court does not place any weight on the fact that Breech did not apply for the position since, as a result of the Board's advertising policies, *see* Note 9, *supra,* and accompanying text, Breech did not learn of the position until it had already been filled.

**25.** The Roberts application is limited, in the Court's opinion, to the opening at McIntosh High School (*See* intervenor's Exhibit 21). Similarly, the Court concludes that the Stephens application was limited to Leroy (*See* intervenor's Exhibit 24). Holcombe, however, was apparently interested in any principalship in the system.

There is no evidence pointing to any of the applicants as more qualified under any of these three criteria than any other applicants. The final criteria utilized by the Board, and probably the one given most attention, is the recommendation of the local Board of Trustees. While this process is not in itself impermissible, it is necessary that the local trustees utilize the same objective criteria that the Board must use and not allow subjective reasoning to impair their choices. The Court is of the opinion that such a technique is commendable to the extent that it allows local people with perhaps the best knowledge of the applicants to participate in the selection process. But the County Board cannot eliminate its requirement of objectivity by merely adopting recommendations not based on objective standards. Accordingly, the Court hereby directs the defendant Board to produce objective non-racial criteria for use by these local Boards in evaluating applicants. In the case at hand, although the Court is convinced that the intervenor established that such objective criteria were not utilized, the evidence does not persuade the Court that either Holcombe or Stephens was the most qualified applicant on an objective standard.[26] Accordingly, the Court must find in favor of the defendant Board with respect to the selection of Jerry Reed.

(b) McIntosh High School—Holcombe and Roberts are the only blacks that the Court views as having standing to contest the McIntosh selection.[27] The most objectively qualified applicant for this position was Gallasneed Weaver, the Indian applicant, by virtue of his fifteen years overall experience in education and the at least six years experience he has had as principal at the Reid's Chapel School. None of the other applicants came even close to matching these qualifications, although Holcombe did have more overall experience. Weaver, however, has not requested any relief in this suit and apparently is content with his other principalship position. Thus at McIntosh, as at Leroy, there is a situation in which the evidence reveals that the Board failed to employ objective non-racial criteria, but that the parties seeking relief are unable to persuade the Court that they would have been selected through utilization of such criteria. Indeed, utilization of such criteria during the McIntosh selection process clearly would not have resulted in the selection of either Holcombe or Roberts. Accordingly, the Court must find in favor of the defendant Board with respect to the selection of Larry Tillman, again with the admonition that if the Board intends to continue to accept the recommendations of the local Trustees it must provide such Trustees with the appropriate criteria by which applicants may be evaluated.[28]

(c) Washington County High School—Holcombe is the only black that the Court considers to have standing to contest the Washington County Selection.[29] The Court concludes that David Howell, by virtue of his principalship experience at Fruitdale High School, was the most qualified applicant for the position. However, as was the case with Weaver on the McIntosh High selection, Howell has not sought relief from the Board's decision and, for the same reasons set forth *supra* regarding the McIntosh appointments, the Court must find in favor of the defendant Board on the question of the selection of Andrew Gibson, with a reiteration of the prior admonition concerning usage of objective non-racial criteria in the selection process.[30]

---

**26.** The Court acknowledges that its conclusion that the Board failed to utilize non-racial objective criteria in its selection process is a sufficient basis for this Court to throw out the 1976 selections and require new selections to be made. This would be a futile requirement, however, since the experience obtained by each of the principals selected, whether selected properly or improperly, would make them the most objectively qualified candidate in each school.

**27.** *See* Note 25 *supra*.

**28.** *See* note 26 *supra*.

**29.** *See* note 25 *supra*.

**30.** *See* note 26 *supra*.

■ 6. The next contentions of discrimination made by the intervenor relate to the hiring of head coaches and administrative staff by the Board. While it is clear that there have been a lack of applicants for these positions by blacks in the past, the intervenor contends that the Board is intentionally perpetuated this paucity of applications by failing to adequately advertise the positions. While the Court is unwilling to accept the advertising process, standing alone, as a clear demonstration of a racially discriminatory intent on the part of the Board in its employment practices, the Court does intend to insist that the Board adopt an appropriate advertisement policy to insure that the most qualified candidates will apply (*see* note 9 *supra* ).[31]

■ 7. The final question for the Court's consideration is the issue joined by the government of whether or not this Court's ruling of February 10, 1977 finding this system desegregated and unitary in nature ought not be reconsidered in light of the evidence in this case. The Court is unswayed by the evidence in this case for it has established only that the defendant Board has in some respects failed to conform its conduct to prior orders of this Court, and there was absolutely no evidence that this system was or is now not desegregated or not unitary in nature. The Court is convinced now, as it was in February of 1977, that the desegregation plan under which the Washington County schools are operating has provided for a desegregated and unitary system of education, and this Court has retained jurisdiction over the case until February of 1980 to assure that the unitariness of the system is not abrogated. *See Youngblood v. Board of Public Instruction of Bay County,* 448 F.2d 770, 771 (5th Cir. 1971). During this period the Board is under order to file reports in accordance with *United States v. Hinds County School Board,* 433 F.2d 611, 618–19 (5th Cir. 1970). At the end of this period all interested parties will be given an opportunity at a hearing to show cause why dismissal of this case ought to be further delayed. *See Wright v. Board of Public Instruction of Alachua County,* 445 F.2d 1397 (5th Cir. 1971). Since the Court is convinced that the Washington County system has been desegregated and unitary for some time now and that adequate procedural safeguards have been and will be afforded, the Court is of the opinion that the government's motion for reconsideration of the February 10, 1977 order is without merit. Accordingly, the motion is denied.

[See following illustration]

---

31. Without concluding that the advertising procedures necessarily discriminate against black persons, the Court does conclude that such procedures mitigate against the search for the most qualified applicants and therefore requires that new procedures be installed. The intervenor contends that this is not enough and that the Board should be required to affirmatively seek out and employ qualified persons for the head coaching and central office positions. While such an affirmative remedy is well within this Court's authority by virtue of the past history of segregation in this district, *see Regents of the University of California v. Bakke,* —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Court is convinced that the failure of the record to indicate that the advertising policies have actually served to discriminate militates against such an affirmative remedy.